UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN
MILWAUKEE DIVISION

---

RICHARD E. BIVENS
6639 West Moltke Avenue
Milwaukee, WI 53210

    Plaintiff,

    v.                          Case No: 20-CV-1548

TARGET CORPORATION
1000 Nicolet Mall
Minneapolis, MN 55403

    Defendant.

---

## COMPLAINT

---

COMES NOW the Plaintiff, Richard E. Bivens, by his counsel, HEINS EMPLOYMENT LAW PRACTICE LLC, by Attorney Janet L. Heins, as and for a claim against the Defendant, alleges and shows to the court as follows:

### JURISDICTION AND VENUE

1. This is a 42 U.S.C. §§ 1981 statutory action, *inter alia,* seeking back pay, damages, attorney fees, and all other damages available from the Defendant for violations of the Plaintiff's rights to equal employment without discrimination based upon the United States.

2. This court has jurisdiction over this matter pursuant to 28 U.S.C. § 1331, as this case involves a federal question under 42 U.S.C. § 1981, as this case involves race discrimination in employment,

3. The unlawful employment practices giving rise to the Plaintiff's claims occurred

within the Eastern District of Wisconsin, and venue is therefore proper in this District pursuant to 28 U.S.C § 1391(b), *inter alia.*

## THE PARTIES

4. Plaintiff, Richard E. Bivens, is an African-American adult male resident of the State of Wisconsin, residing in Milwaukee County at 6639 West Moltke Avenue, Milwaukee, WI 53210.

5. Defendant, Target Corporation was, at all times material herein, a foreign corporation, with a principal address of 1000 Nicolet Mall, Minneapolis, Minnesota 55403, and in Waukesha County, Wisconsin at 1100 Valley Road, Oconomowoc, Wisconsin 53066.

## THE FACTS

6. Plaintiff was hired by Defendant on September 17, 2001 as a warehouse worker at the Oconomowoc location of Defendant, where he remained for the duration of his employment by Defendant.

7. Defendant's Oconomowoc location is a secure facility with full video monitoring.

8. Entrance to Defendant's Human Resources Department is controlled by a computer system that requires an employee to swipe his company-issued identification to enter.

9. Defendant's supervisors and management are predominantly non-African-American.

10. Plaintiff was the only African-American employee in his work group at Defendant throughout most of his employment.

11. Early in his employment at Defendant, the company insisted on including Plaintiff in an informational video for warehouse workers because of his good performance and because he was one of few African-American warehouse workers.

12. At all times material herein, Plaintiff performed his work duties in accordance with the reasonable expectations of the Defendant.

2

13. Plaintiff was proud of his nearly perfect attendance throughout his employment, despite living 30 miles away from work and going to work in bad weather.

14. Plaintiff's position at Defendant required him to unload pallets from company semi-trucks and sort them for distribution to the proper destination.

15. Supervisors and Managers at Defendant had unfettered discretion to assign trucks for unloading to particular warehouse workers.

16. Warehouse workers were given a quota of work to be performed in unloading Defendant's trucks, which allowed them to receive bonuses and other benefits as a result of reaching or exceeding their quotas.

17. Some of Defendant's trucks had few different products located on their pallets and were much easier and faster to unload and process by warehouse workers at Defendant, thereby filling their quotas much faster.

18. Some of Defendant's trucks had a wide variety of different products on their pallets and were much more difficult and slower to unload and process by warehouse workers at Defendant, thereby filling their quotas much slower.

19. On a nearly daily basis during his employment, Plaintiff's non-African American coworkers made racial slurs and comments to him while he performed his warehouse duties.

20. Plaintiff observed that Defendant's management allowed and even condoned such behavior against Plaintiff, so he did his best to complete his work despite the hostile work atmosphere at Defendant.

21. Plaintiff's non-African American coworkers and supervisors also routinely excluded Plaintiff based on his race from group outings and events throughout his employment, both at work and outside of work.

22. Plaintiff recalls that on one such occasion, one non-African-American coworker told another non-African-American coworker within Plaintiff's hearing that Plaintiff was a "porch monkey," an old slur against African-Americans.

23. When the recipient of the "porch monkey" comment reported the obvious racial slur to Defendant's Human Resources, Defendant took no action against the worker who made the comment.

24. Plaintiff recalls that one non-African American coworker put his hand into a pistol shape and asked Plaintiff if this was how they do it "in the hood," another racial slur.

25. Plaintiff's non-African-American coworkers regularly used the racial epithet "nigger" and similar offensive racial epithets at work within his hearing.

26. Plaintiff regularly complained to his supervisors and to Defendant's Human Resources about the racially hostile working environment at Defendant, but the racial comments and behaviors continued unabated.

27. After Plaintiff had completed many years of successful employment with no write-ups, Justin Forenza (white male) became Plaintiff's supervisor at Defendant in 2010.

28. Mr. Forenza immediately gave Plaintiff his first write-up at Defendant, dated December 5, 2010.

29. It seemed to Plaintiff that Mr. Forenza had never been around African-Americans in the way he approached his dealings with Plaintiff, as Plaintiff did not fit the stereotype of African Americans that Mr. Forenza held.

30. Mr. Forenza continued to unfairly and without basis write up the Plaintiff routinely over Plaintiff's complaints about receiving an unfairly high percentage of the work to be distributed among the employees in Plaintiff's work area.

31. Mr. Forenza wrote Plaintiff up on October 15, 2011, over his lack of "teamwork" with his racist team members.

32. Mr. Forenza wrote Plaintiff up many times for disagreeing in a professional manner with Mr. Forenza's decisions, claiming that Plaintiff was insubordinate, when Plaintiff was pointing out discrimination against him.

33. When the task of reviewing Plaintiff's performance was assigned to newly hired Keisha Oliver Hayes during this time, she told Plaintiff that she was given that assignment because none of the other supervisors wanted to deal with Plaintiff.

34. Plaintiff asked Human Resources if the Defendant could arrange some type of mediation between Plaintiff and Mr. Forenza, but Defendant took no actions to respond to Plaintiff's complaints.

35. Mr. Forenza disproportionately assigned Plaintiff to unload trucks with a wide variety of different products on their pallets, so that Plaintiff would have to work harder than the non-African-American employees in order to make his quota and earn any benefits.

36. Mr. Forenza took away from Plaintiff his "special functions" at Defendant, the good extra jobs that were available to employees, and Mr. Forenza would not give Plaintiff any new special functions or train him on any others.

37. Although Plaintiff had the most seniority of the warehouse workers that Mr. Forenza supervised, Mr. Forenza still treated him worse than non-African-American employees, even those who had just started working for Defendant.

38. After a few years, Mr. Forenza went to a different shift and Plaintiff got a different supervisor, who then gave him special functions to perform.

39. In early 2015, Plaintiff made a comment to his supervisor at the time, not Mr. Forenza,

that the supervisor's actions in making assignments were "bullshit." Plaintiff received a baseless write-up for this comment, dated March 14, 2015.

40. After Plaintiff received that write-up, Defendant's Senior Group Leader, Ms. Anderson, came by to talk to Plaintiff, in his view because she felt guilty that Plaintiff had been written up on such petty grounds.

41. Plaintiff told Ms. Anderson at that time and on other occasions about the racism he was experiencing in the workplace at Defendant, but Defendant took no action on Plaintiff's complaints.

42. Then Plaintiff changed shifts and again had Mr. Forenza as his supervisor, whose first action against Plaintiff was to take away his special functions again.

43. Other warehouse workers at Defendant observed that Mr. Forenza treated Plaintiff worse than any of the non-African-American employees, and they commented upon it to the Plaintiff.

44. Mr. Forenza often came to Plaintiff when he was unloading an easier truck, take him off that assignment, and move him to a more difficult truck where it would be hard for Plaintiff to make his quota.

45. Mr. Forenza accused Plaintiff of having poor attendance, falsely accusing him of missing 30 hours in a year.

46. When Plaintiff investigated, he discovered that Mr. Forenza had falsified Plaintiff's attendance to add many false no-call, no-shows on Plaintiff's employment record at Defendant.

47. Plaintiff then began carefully monitoring his attendance record to ensure that Mr. Forenza did not alter it further.

48. When Mr. Forenza asked Plaintiff what he could do to improve Plaintiff's attendance, Plaintiff said he could treat him the same as everyone else regarding "not scheduled" time, so that

6

Case 2:20-cv-01548-NJ   Filed 10/07/20   Page 6 of 12   Document 1

Plaintiff could use vacation pay for days he was not needed at work.

49. In response, Mr. Forenza angrily lied to Plaintiff and denied that Plaintiff had asked for "not scheduled" time.

50. The next day, Mr. Forenza wrote Plaintiff up for "disrespecting" him and being insubordinate, when Plaintiff had done neither.

51. Plaintiff disputed the write-up for "disrespecting" Mr. Forenza, and Mr. Forenza then agreed that Plaintiff did not say the words Mr. Forenza accused him of saying.

52. Plaintiff then went to Defendant's Human Resources, which denied writing the false quote in Plaintiff's write-up. Plaintiff had four different meetings to discuss this matter, and he told Human Resources each time that Mr. Forenza had lied to HR to get him in trouble.

53. Human Resources then came back to Plaintiff with a "solution." Defendant's HR gave Plaintiff a new write-up without the false quote, rendering the write-up baseless on its face.

54. After Plaintiff received the amended write-up from Defendant's Human Resources, Mr. Forenza's boss came to Plaintiff and said the situation was "done."

55. Plaintiff told Mr. Forenza's boss that Mr. Forenza had given him previous baseless write-ups, and he also pointed out that he had had no write-ups with his previous eleven supervisors prior to Mr. Forenza.

56. Plaintiff observed that Mr. Forenza had poisoned his employment relationship with Defendant's management.

57. In late May or early June 2017, Plaintiff was working to unload a truck that he had been assigned. Mr. Forenza came to Plaintiff, took Plaintiff away from that truck and reassigned Plaintiff to work a much more difficult truck that would make it difficult for Plaintiff to make his quota.

7

58. After Mr. Forenza reassigned Plaintiff to the other truck, Plaintiff, in accordance with Defendant's policies and procedures, "unreceived" the labels for the first truck that he had already "received" but not yet processed for distribution, so that the next person who finished the truck would be able to "receive" the labels and perform his job properly and receive quota credit for the work he did to complete unloading the truck for distribution.

59. Defendant falsely claimed that Plaintiff finished unloading that truck, even though Mr. Forenza took him away from the truck before he could finish it.

60. Several days went by after Plaintiff's reassignment to a different truck that day and Plaintiff continued to perform his work satisfactorily, in accordance with Defendant's policies and procedures.

61. No one at Defendant informed Plaintiff that he was being investigated for anything in May or June 2017, and he never met with Human Resources or Defendant's management to discuss any allegations of wrongdoing against him.

62. In early June 2017, Defendant was, however, investigating white warehouse worker Scott Fruncek for fraudulent activity in the warehouse in unreceiving freight. Despite documenting potentially fraudulent activity by Mr. Fruncek, Defendant took no action against him.

63. However, Defendant had supposedly identified an instance where Plaintiff improperly unreceived labels on May 31, 2017, but it is unclear whether that is the date that Plaintiff was not able to finish his truck after Mr. Forenza reassigned him.

64. Defendant's internal correspondence dated June 7, 2017, reveals that "We just need to make sure we are not only investigating [Plaintiff] in this situation."

65. On approximately June 9, 2017, Mr. Forenza announced in a meeting at which Plaintiff was present that he was leaving his position to move to Georgia. After hearing that, Plaintiff

8

turned to a coworker, Jeff Graff, and predicted that Mr. Forenza would get Plaintiff fired before he left for Georgia.

66. On June 11, 2017, Plaintiff was unloading a truck of diapers at Defendant, but he did not finish unloading the truck after Mr. Forenza took him off that truck and put him on a truck that took longer to unload. Plaintiff "unreceived" the freight that he had not fully processed when Mr. Forenza took him off the truck, and he did not unload any more of the freight on that truck after doing so.

67. Defendant falsely accused Plaintiff of acting improperly to benefit himself by "unreceiving" freight on June 11, 2017, using that claim to support its termination of Plaintiff.

68. On or about June 13, 2017, a supervisor escorted Plaintiff to Human Resources, where Karen Miller and Ms. Anderson led Plaintiff to an empty office.

69. When Plaintiff entered Human Resources, he observed at least six Human Resources team members working inside cubicles outside the office.

70. During the meeting in Defendant's Human Resources on or about June 13, 2017, Plaintiff was told for the first time by Defendant that he was being accused of wrongdoing regarding the unfinished truck from which Mr. Forenza had removed him.

71. Plaintiff asked in the meeting if he was being fired. Both Ms. Miller and Ms. Anderson assured him that he was not fired. They told Plaintiff they were going to investigate the matter of the unfinished truck and get back to Plaintiff, and that they were sending him home with pay. Ms. Miller and Ms. Anderson told Plaintiff that he was not to go back into the warehouse to get his things.

72. After the meeting on or about June 13, 2017, as Plaintiff left HR, he noticed that no employees remained working in the cubicles in Human Resources, and that HR had been cleared out.

9

73. As Plaintiff left Defendant's building after the meeting on or about June 13, 2017, he noticed two police cars outside. Plaintiff left Defendant's property without incident and without making contact with any police officers.

74. Approximately ten minutes after Plaintiff had left Defendant's property following the meeting on or about June 13, 2017, Ms. Miller called Plaintiff and informed him that his employment was terminated.

75. During the meeting, Defendant apparently had police officers waiting in an adjacent office in Human Resources for him.

76. Plaintiff posed no threat to Defendant, and he believes that Human Resources called the police on him because he is African-American. Plaintiff found it very hurtful and degrading that Defendant called the police about his termination, assuming that he would be violent based on his race.

77. In response to Plaintiff's administrative discrimination complaints filed with the Wisconsin Equal Rights Division, Defendant claimed on July 30, 2018 that it had police present for Plaintiff's termination because he was written up three years earlier for using "bullshit" to a supervisor, and its belief that "termination could result in a potential threat of harm to others or the building." Defendant falsely claimed that this was Plaintiff's "previous volatile behavior" necessitating a police presence at his termination.

78. In Plaintiff's 16 years of work at Defendant, he witnessed numerous terminations of other employees, and police were not called to any of the non-African-American employees' termination unless there was a criminal act or threat to Human Resources or a team member.

79. Plaintiff had not engaged in a criminal act or made a threat to anyone, and he did not understand why Defendant called the police to escort him out after termination for any reason other

10

than his race.

80. In response to Plaintiff's administrative discrimination complaints filed with the Wisconsin Equal Rights Division, Defendant claimed on July 30, 2018 that Plaintiff was terminated because he "unethically and falsely adjusted his productivity numbers."

81. In response to Plaintiff's administrative discrimination complaints filed with the Wisconsin Equal Rights Division, Defendant claimed on July 30, 2018 that "no other team members engaged in this unethical behavior."

82. Plaintiff has satisfied all conditions precedent to bringing this action.

**CLAIM FOR RELIEF—42 U.S.C. § 1981 Race Discrimination & Retaliation**

83. Plaintiff realleges and incorporates paragraphs 1-82 of this complaint by reference.

84. Defendant unlawfully discriminated against and terminated Plaintiff on the basis of his race, African-American, and in retaliation for his protected complaints of race discrimination, in violation of his freedom of contract rights under the Thirteenth Amendment to the United States Constitution, as protected by 42 U.S.C. § 1981.

85. As a direct, foreseeable, and proximate result of Defendant's unlawful discrimination and retaliation, Plaintiff has suffered injury and damages in the form of lost wages, lost employment benefits, and emotional distress. These damages continue into the present and will continue into the foreseeable future.

**WHEREFORE**, Plaintiff respectfully requests that this Court:

1. Order Defendant to make Plaintiff whole by providing appropriate back pay, front pay

11

and/or reinstatement, compensatory and punitive damages, pre-judgment and post-judgment interest, and reimbursement for other benefits and expenses in an amount to be shown at trial;

    2.    Grant to Plaintiff his attorney fees, costs and disbursements as provided by 42 U.S.C. § 1988, and all other applicable statutes and provisions; and

    3.    Grant to Plaintiff whatever other relief this Court deems just and equitable.

Dated this 7th day of October, 2020.

                    HEINS EMPLOYMENT LAW PRACTICE LLC
                    Counsel for the Plaintiff

                    *s/ Janet L. Heins*
                    Janet L. Heins, State Bar No. 1000677

HEINS EMPLOYMENT LAW PRACTICE LLC
200 South Executive Drive, Suite 101
Brookfield, WI  53005
(262) 241-8444 voice
e-mail: jheins@heinslawoffice.com